UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CALENTURE, LLC *and* NOSIRRAH
MANAGEMENT LLC,

                              Plaintiffs,

            – *against* –

SOFINNOVA VENTURE PARTNERS
X, L.P., SOFINNOVA MANAGEMENT
X, L.P., *and* SOFINNOVA
MANAGEMENT X-A, L.L.C.,

                              Defendants,

            – *and* –

VERA THERAPEUTICS, INC.,

                              Nominal
                              Defendant.

**OPINION & ORDER**

24-cv-04194 (ER)

RAMOS, D.J.:

        Calenture, LLC ("Calenture") and Nosirrah Management, LLC ("Nosirrah," and together with Calenture "Plaintiffs") bring this action against Sofinnova Venture Partners X, L.P. ("Sofinnova Partners"), Sofinnova Management X, L.P. ("Sofinnova X"), and Sofinnova Management X-A, L.L.C. ("Sofinnova X-A," and collectively "Defendants") for alleged insider trading in violation of Section 16(b) of the Securities Exchange Act of 1934 (the "Act").  Doc. 31 (First Amended Complaint or "FAC") ¶ 1.

        Before the Court is Defendants' motion to dismiss the FAC pursuant to Federal Rule of Civil Procedure 12(b)(6).  Doc. 36.  For the reasons set forth below, the motion is DENIED.

## I.    BACKGROUND

### A.  Factual Background

The following facts are based on the allegations in the FAC, which the Court accepts as true for purposes of the instant motion.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

### 1.  Structure of the Companies and Dr. Maha Katabi's Role

Calenture is a New York corporation with its principal place of business in New York.  ¶ 12.  Nosirrah is a Delaware corporation with its principal place of business in New York.  ¶ 13.

Vera Therapeutics, Inc. ("Vera") is a Delaware corporation with its principal place of business in California.  ¶ 17.  Both Calenture and Nosirrah are shareholders of Vera. ¶¶ 12–13.  According to Defendants' motion, Vera is a clinical-stage biopharmaceutical company.  Doc. 37 at 9.

Sofinnova Partners is a Delaware corporation with its principal place of business in California.  ¶ 14.  All of the Vera securities purchased and sold by Defendants were held directly by Sofinnova Partners.  *Id.*  Vera's Class A common stock was registered under Section 12(b) of the Act, 15 U.S.C. § 78*l*(b), and was listed for trading on the Nasdaq Global Select Market.  ¶ 17.

Sofinnova X is a Delaware corporation with its principal place of business in California.  ¶ 15.  Sofinnova X served as a general partner of Sofinnova Partners and directly exercised voting and investment power over all Vera securities in Sofinnova Partners' portfolio.  *Id.*

Sofinnova X-A is a Delaware corporation with its principal place of business in California.  ¶ 16.  Since at least February 2023, Sofinnova X-A served as a general partner of Sofinnova X and, through Sofinnova X, exercised voting and investment power over all Vera securities in Sofinnova Partners' portfolio.  *Id.*

Defendants first invested in Vera in October 2020 when Vera, then privately owned, raised $80 million from the sale of its Series C Convertible Preferred Stock ("Series C").[1] ¶ 20. Defendants, along with three other principal investors[2], each purchased $15 million of the $80 million Series C stock offered. ¶ 21.

The $15 million investment represented a substantial wager on a clinical-stage biopharmaceutical company, such as Vera, because it had not generated any significant revenue. ¶ 21. In fact, Vera had not generated any significant revenue as of October 4, 2024, when the FAC was filed. ¶ 21.

Investments of this magnitude allegedly usually require hands-on involvement in company management by the investor. *Id.* Accordingly, to protect their investments, Defendants and the other three principal Series C investors negotiated with Vera to secure board representation and other governance and economic rights. ¶ 22. By a "Second Amended and Restated Voting Agreement" ("Voting Agreement"), dated October 29, 2020, Vera gave each of the four principal Series C investors the right to designate a member to Vera's board of directors and obligated the investors to vote their shares in favor of one another's designees. ¶¶ 24–25.

Pursuant to the Voting Agreement, Sofinnova Partners designated Dr. Maha Katabi as its representative on Vera's board, and she has served continuously in that role since October 2020. ¶ 26. Vera's filings with the Securities and Exchange Commission ("SEC") identified Dr. Katabi as a general partner of Sofinnova Partners. ¶ 18. Sofinnova Investments, Inc., the holding company for Sofinnova Partners, referred to her as a "shareholder, director and vice president" of Sofinnova Investments, Inc., and as its "control person." *Id.*

---

[1] The Series C stock constitutes the third round of equity financing for the company.

[2] The FAC does not specify who the other three principal investors were.

The four principal investors also entered into a Second Amended and Restated Investors' Rights Agreement dated October 29, 2020 ("Investors' Rights Agreement"). ¶ 27; Doc. 31-1.

Section 3.5 of the Investors' Rights Agreement obligated each of the four investors to "keep confidential and . . . not disclose, divulge, or use for any purpose (other than to monitor its investment in the Company) any confidential information obtained from the Company pursuant to the terms of this Agreement." ¶ 29; Doc. 1-1 at 19.

Section 3.6 of the Investors' Rights Agreement elaborated on the investors' rights to receive and use confidential information from Vera:

> [Vera] understands and acknowledges that in the regular course of their respective businesses, certain Professional Investors (including, without limitation, Abingworth, Longitude, Sofinnova and Surveyor) and their respective Affiliates will or may invest in companies that have issued securities that are publicly traded (each, a "Public Company"). Accordingly, [Vera] covenants and agrees that it shall (a) not provide any material non-public information about a Public Company to Surveyor or any representative or board observer of Surveyor, and (b) notify any director, observer or other representative affiliated with any Professional Investor (other than Surveyor) of Vera's intent to disclose material non-public information about a Public Company prior to making such disclosure. In addition, [Vera] acknowledges and agrees that in no event shall the confidentiality and non-use obligations of any Professional Investor (including, without limitation, Abingworth, Longitude, Sofinnova and Surveyor) hereunder in any manner be deemed or construed as limiting any Professional Investor or its representatives' (or any of their respective Affiliates) ability to trade any security of a Public Company.

*Id.*

Dr. Katabi signed the Investors' Rights Agreement on behalf of Sofinnova Partners. ¶ 31. Her signature block identified her as the "Managing Member" of Sofinnova X, the predecessor entity to Sofinnova X-A, which served as the "General Partner" of Sofinnova Partners. *Id.*

Vera completed its initial public offering ("IPO") in May 2021, just over six months after the Series C round. ¶ 32. The Voting Agreement terminated upon the completion of the IPO, ¶ 33, but Dr. Katabi continued to represent Defendants on Vera's board until at least October 4, 2024. ¶ 34.

Most of the Investors' Rights Agreement, including Sections 3.5 and 3.6, survived the IPO and remains in force. ¶ 35. Section 3.4 of the Investors' Rights Agreement, titled "Termination of Information Rights," provides that "[t]he covenants set forth in Sections 3.1, 3.2 and 3.3 shall terminate and be of no further force or effect . . . immediately before the consummation of an IPO." ¶ 36. No term of the Investors' Rights Agreement purports to terminate Sections 3.5 and 3.6. *Id.*

According to the Investors' Rights Agreement and Vera's 2023 Annual Report on Form 10-K, filed with the SEC on March 27, 2024, Vera was required to file the Investors' Rights Agreement as an exhibit to its Form 10-K because the agreement remains an "[i]nstrument[] defining the rights of securities holders" within the meaning of Item 601 of Regulation S-K. ¶ 38; 17 C.F.R. § 229.601(a) ex. tbl., (b)(4).

Section 3.6 of the Investors' Rights Agreement allowed Vera to "provide . . . material non-public information" to Sofinnova Partners or its "representative," ¶ 39, and repudiated any construction of the Agreement's "confidentiality and non-use obligations" that would "limit[] any Professional Investor or its representatives' ability to trade any security of a Public Company." ¶ 40. Section 3.5 of the Agreement continued to guarantee Sofinnova Partners' right to use confidential information for the purpose of "monitor[ing] its investment" in Vera. ¶ 41.

Sections 3.5 and 3.6 gave Defendants access to significant material nonpublic information about Vera. ¶ 42. For example, the confidential information included any "notice of [Vera's] intention to file a registration statement." ¶ 43.

An issuer's intention to file a registration statement is highly material information. ¶ 44. The filing of a registration statement often causes a sharp drop in the issuer's stock

price because it signals that the issuer or a selling stockholder is poised to "dump" a large block of stock on the market in a possibly dilutive offering.  *Id.*

Dr. Katabi was one of the representatives of Sofinnova Partners whose ability to trade securities in public companies was protected by §§ 3.5 and 3.6, and she relied on this language to make trading decisions on behalf of Sofinnova Partners.  ¶ 45.

When Vera went public in May 2021, Sofinnova Partners had three portfolio managers.  ¶ 46.  In a statement of beneficial ownership on Schedule 13D filed with the SEC by Sofinnova Partners shortly after the IPO, it identified those three portfolio managers as Dr. Katabi, Dr. Michael F. Powell, and Dr. James I. Healy.  *Id.*  Dr. Powell left Defendants by February 2023.  ¶ 47.

Defendants filed statements on Schedule 13D with respect to Vera's Class A common stock and did not disclose any limitation on Dr. Katabi's power to participate in decision-making related to Sofinnova Partners' investment in Vera.  ¶ 49.  Instead, the statements defined "Reporting Persons" to include Dr. Katabi and represented that any transactions in Vera's Class A common stock would be based in part on "the Reporting Persons' . . . ongoing evaluation of [Vera's] business, financial condition, operations and prospects."  ¶ 50.

All of the statements filed by Defendants on Schedule 13D since February 2023 identified Dr. Katabi and Dr. Healy as the sole managing members of Sofinnova X-A, and only natural persons who "may be deemed to have shared dispositive power" over the Class A common stock held by Sofinnova Partners.  ¶¶ 47, 51.

As is common in the venture capital industry, Dr. Katabi's performance as a portfolio manager was incentivized through fees and fund interests that tied her overall compensation to the fund's return on its investments.  This arrangement aligned her interests with those of the fund and encouraged her to use information obtained from Vera for the fund's benefit.  ¶ 53.  Dr. Katabi's statement of changes in beneficial ownership filed with the SEC, dated March 21, 2024, disclosed that: "Dr. Katabi is liable for short-

swing profits to the extent of her pecuniary interest in the Purchase and such portion of the sales reported herein.  Dr. Katabi has agreed with [Vera] to disgorge her short-swing profits attributable to the matching of the Purchase with the sales reported herein." ¶ 54; Doc. 31-14 at 2.

All transactions in Vera's equity securities by Defendants over the past year were made under Dr. Katabi's purview as a "general partner" of Sofinnova Partners, and under the co-direction of her and Dr. Healy as the joint managers of the fund.  ¶ 55.

When Vera conducted a registered public offering of its stock in January 2024, the underwriters of the offering required all of Vera's officers and directors to enter into lock-up agreements barring them from selling Vera's stock within 60 days of the date of the prospectus supplement for the offering.  ¶ 57.  The underwriters also demanded and received a 45-day lock-up from "certain stockholders affiliated with our directors."  ¶ 58.

These "certain stockholders" included Sofinnova Partners.  ¶ 59.  No lock-up was required of stockholders without representation on Vera's board, even though some of those stockholders owned more Vera stock than Defendants.  *Id*.  Defendants agreed to this lock-up arrangement because Dr. Katabi served on Vera's board, even as larger investors were free to sell.  ¶ 61.

The website for Sofinnova Ventures, Inc.[3] continues to tout its investment in Vera, listing positive Vera press releases and other Vera information on the site under the heading "Portfolio News."  ¶¶ 18, 62.

Separately, Dr. Katabi was also featured in a November 2023 article titled "2023's Fiercest Women in Life Sciences," which profiled her and her work at Sofinnova, noting that she "led the charge on Vera Therapeutics."  ¶ 63.  The article quoted Dr. Katabi, who explained that "[a]t Sofinnova, the team 'really digs deep' into the projects they invest in," and "partner[ed] with 'fun' management teams."  ¶ 64.  Dr. Katabi added:  "To me, what's

---

[3] The complaint does not otherwise mention Sofinnova Ventures, Inc. or explain what it is.

important as a general partner is to realize exactly what type of inputs you need to make the best possible investment decisions." ¶ 65.

Dr. Katabi also made other public statements. ¶ 67. When asked in a March 2024 interview about "[w]hat defines your portfolio," Dr. Katabi answered, "We work closely with management teams to establish a clinical development plan that aligns with regulatory standards and follow a clearly defined regulatory path." ¶ 68. She promised that "[o]ur team will continue to partner with entrepreneurs and pharmaceutical companies to take transformative therapies from the lab to . . . patients." ¶ 69. She clarified that the "partnership" does not end when a portfolio company goes public: "We actively partner with entrepreneurs across all stages of company formation." ¶ 70.

Another interview taken at an unspecified time referred to Dr. Katabi as the "Sofinnova general partner" who "ha[d] been in the boardroom of two recent M&A exits:[4] radiopharmaceuticals maker RayzeBio, sold to Bristol Myers Squibb, and asthma startup Aiolos Bio, to GSK." ¶ 71.

Additionally, Dr. Katabi worked as Defendants' deputy on Vera's board. ¶ 74.

a. *Dr. Katabi's 2023 "At Large" Election*

Dr. Katabi chaired Vera's nominating and corporate governance committee (the "Nominating Committee"), and has held that chair since Vera went public. ¶ 75. The Nominating Committee's charter gives the committee authority to "identify and evaluate candidates, including nomination of incumbent directors for reelection and nominees recommended by stockholders to serve on [Vera's] Board." ¶ 76.

As chair of Vera's Nominating Committee, Dr. Katabi had more power to "assemble [its] board" than any other person. ¶ 80. She used that power on Defendants' behalf to place herself on Vera's official slate of director candidates at the 2023 annual meeting. *Id.*

---

[4] An M&A exit refers to a company or investor selling their ownership through a merger or acquisition.

Vera's charter, bylaws, and plurality voting rules were in effect at the time of Dr. Katabi's 2023 election and are summarized in the "Risk Factors" section of Vera's Annual Report for that year.  ¶¶ 81–82.

Vera's charter and bylaws divide the board into three classes of roughly equal size. ¶ 84.  Only one class stands for election each year, making it impossible for a competing slate of candidates to replace a majority of the board at a single election.  *Id.*  Even if an activist got a foothold on the board by replacing a single class of directors, the incumbent majority could neutralize the insurgent's influence by appointing additional directors to the board. ¶ 85.  Vera's certificate of incorporation allows the board, by a simple majority vote, to increase the number of seats on the board and to fill any vacancies.  *Id.*

While the board has the power to amend Vera's bylaws, none of the charter or bylaw provisions described above can be modified by Vera's stockholders except upon the vote of at least two-thirds of the combined voting power of all shares of Vera's capital stock then outstanding.  ¶ 87.  At the time of Dr. Katabi's election in 2023, the Class A common stock was Vera's only class of capital stock outstanding.  ¶ 88.  The Series C investors then held collectively approximately 26% of that class, and Vera's pre-IPO investors collectively held approximately 35%.  *Id.*  Because the amendment of Vera's bylaws requires the voting power of two-thirds of Vera's outstanding shares, it was virtually impossible for an activist shareholder to challenge Vera's board through a proxy contest. *Id.*

In addition, Vera's plurality voting system guarantees the election of unopposed candidates.  ¶ 90.  Under this system, the director nominees with the most votes are elected even if they do not have the support of a majority of Vera's stockholders.  *Id.*  This means that an unopposed director nominee can be elected to Vera's board even if more than half of the votes go to other candidates.  *Id.*  It also means that, when the number of nominees equals the number of seats to be filled, a nominee will be elected as long as she receives just one vote in her favor.  ¶ 91.

Three seats on Vera's eight-member board were up for election in 2023.  ¶ 93.  Dr. Katabi, exercising her power as chair of the Nominating Committee, ensured that she was nominated for election along with the other two incumbent directors.  *Id*.  The provisions of Vera's charter and bylaws prevented an insurgent slate, ensuring that Vera's three nominees ran unopposed.  *Id*.  Without opposition, Dr. Katabi could secure election with just a single vote.  *Id.*  In any event, Defendants then held approximately 3,467,156 shares of Vera's Class A common stock that could be cast in Dr. Katabi's favor.  *Id.*

> b.  *Dr. Katabi's Independence Under the Exchange Rules*

Vera's board determined that Dr. Katabi qualified as an "independent" director under Nasdaq listing rules between 2022 and 2024.  ¶ 95.  According to Vera's 2023 proxy statement, the board assessed its members' independence based on a "review of all relevant identified transactions or relationships between each director, or any of his or her family members, and the Company, its senior management and its independent auditors."  ¶ 96.  The proxy statement adds that "[i]n making this determination, the Board found that none of these directors," including Dr. Katabi, "had a material or other disqualifying relationship with the Company."  *Id.*

> c.  *Dr. Katabi's Service on the Boards of Other Companies*

According to SEC records, Dr. Katabi has served as a director of two public companies in addition to Vera:  RayzeBio, Inc., and Aerovate Therapeutics, Inc.  ¶ 112.  Both of these issuers were in Defendants' portfolio of companies.  ¶ 113.  RayzeBio had been in business since January 2020, but Dr. Katabi did not become a director until August 2022—just after Defendants invested in the company.  ¶ 114.

Aerovate had been in business since July 2018, but Dr. Katabi did not become a director until August 2020, just after Defendants invested in the company.  ¶ 115.

Dr. Katabi's public company directorships have always been in companies that are in Defendants' portfolio.  ¶ 116.

The record of Dr. Katabi's private directorships is no different. ¶ 117. According to Vera's most recent proxy statement,[5] Dr. Katabi has served as a board member of the following private companies: Gyroscope Therapeutics Limited, Amplyx Pharmaceuticals, Inc., Aiolos Bio, Inc., Northsea Therapeutics, B.V., Star Therapeutics, Inc., and Quanta Therapeutics, Inc. *Id.* Each of these companies was in Defendants' portfolio at the time of Dr. Katabi's board service. ¶ 118.

### 2. *Sofinnova Partners' Short Swing Trades*

Sofinnova Partners purchased and sold millions of dollars' worth of Vera's equity securities, all within a single period of less than six months. ¶ 122.

On January 30, 2024, Sofinnova Partners purchased 161,290 shares of Vera's Class A common stock at a price of $31.00 per share from the underwriters of a registered public offering. ¶ 123. Less than six months later, Sofinnova Partners sold Vera's equity securities over the open market as follows:

> (1) On March 21, 2024, Sofinnova Partners sold 32,756 shares of Vera's Class A common stock at a weighted average price of $43.00 per share, 21,918 shares at a price of $44.00 per share, 12,617 shares at a weighted average price of $45.52 per share, and 13,718 shares at a weighted average price of $46.18 per share;

> (2) On March 22, 2024, Sofinnova Partners sold 413,450 shares of Vera's Class A common stock at a weighted average price of $40.51 per share; and

> (3) On March 25, 2024, Sofinnova Partners sold 340,000 shares of Vera's Class A common stock at a weighted average price of $40.50 per share.

¶ 124.

Comparably, Vera's Class A common stock reached its all-time high of $50.78 per share on March 1, 2024. ¶ 127. Defendants were locked up for 45 days following the January 30, 2024 public offering and could not sell earlier. ¶ 128.

---

[5] The FAC does not specify the date of this statement.

The stock price slid after Defendants' sales. ¶ 129. On October 3, 2024, the last day before this First Amended Complaint was filed, Vera's Class A common stock closed at $40.49 per share. *Id.* The stock thus sits close to Defendants' lowest sale price and still well above their January 30, 2024, purchase price. ¶ 130.

Defendants realized a profit currently estimated at $1,832,916.39 from the transactions between January 30 and March 25, 2024. ¶ 131.

Sofinnova Partners had a direct pecuniary interest in the profit-realized because it held the shares traded, and thus paid the price for and received the proceeds of any shares purchased and sold. ¶ 133. Sofinnova X and Sofinnova X-A each had an indirect pecuniary interest in the profit realized by virtue of holding, directly or indirectly, general partnership interests in Sofinnova Partners. ¶ 134.

Dr. Katabi has repaid to Vera an undisclosed amount of profit, representing her pecuniary interest in the profit realized by Defendants. ¶ 136. The remainder of the profit realized by Defendants has not been repaid. *Id.*

### B. Procedural History

Plaintiffs filed the instant lawsuit on May 31, 2024, and filed the FAC on October 4, 2024, for recovery of short-swing profits under Section 16(b) of the Act. Docs. 1, 31. Defendants moved to dismiss the FAC in its entirety pursuant to Fed. R. Civ. P. 12(b)(6) on November 8, 2024, arguing a lack of Section 16(b) liability. Doc. 36.

## II. LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted

unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). However, this "flexible plausibility standard" is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (internal quotation marks and citation omitted), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss, *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F.Supp.2d 598, 615 (S.D.N.Y 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). Indeed, "the purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotation marks and citation omitted). Thus, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). In considering a Rule 12(b)(6) motion, a district court may also consider "documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *Doe v. N.Y. Univ.*, No. 20 Civ. 1343 (GHW), 2021 WL 1226384, at *10 (S.D.N.Y. Mar. 31, 2021) (quoting *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010)).

## III.  DISCUSSION

### A.  The Court Will Consider Vera's 2023 Proxy Statement in Its Entirety But Not Vera's IPO Registration Submitted by Defendants

As a preliminary matter, Defendants ask the Court to consider: (1) Vera's IPO registration statement, dated April 23, 2021, Doc. 38-1; (2) Vera's proxy statement, dated March 30, 2023, Doc. 38-2; and (3) Vera's Form 8-K, dated May 10, 2023, Doc. 38-3. Doc. 40 at 6–8.

In adjudicating a motion to dismiss, a court may consider only the complaint, exhibits to the complaint, any statements or documents incorporated in it by reference, and documents integral to it. *ASARCO LLC v. Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014) (quoting *In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013)). "To be incorporated by reference, the complaint must make a clear, definite[,] and substantial reference to the documents." *Bill Diodato Photography L.L.C. v. Avon Products, Inc.*, No. 12 Civ. 847 (RWS), 2012 WL 4335164, at *3 (S.D.N.Y. Sept. 21, 2012) (citation omitted). And "[t]o be integral to a complaint, the plaintiff must have (1) actual notice of the extraneous information and (2) relied upon the documents in framing the complaint." *Id.* (alteration in original) (citation omitted). Thus, where a document is partially quoted in a complaint, the Court may generally consider its full text. *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies*, Inc. 75 F.3d 801, 808 (2d Cir. 1996).

Although the Court may take judicial notice of documents filed with the SEC, it "is to consider them on a Rule 12(b)(6) motion 'only to determine what the documents stated,' and 'not to prove the truth of their contents.'" *Wagner v. Royal Bank of Scotland Grp. PLC*, No. 12 Civ. 8726 PAC, 2013 WL 4779039, at *3 (S.D.N.Y. Sept. 5, 2013) (internal citations omitted); *see also Chechele v. Scheetz*, 466 Fed. Appx. 39, 40–41 (2d Cir. Mar. 9, 2012) (affirming dismissal of Section 16(b) claim where "[t]he district court declined to consider certain SEC filings, which were not incorporated into the complaint, for the truth of their assertions.").

Regarding Vera's IPO registration statement, however, Defendants merely argue that it "is the source of the FAC's allegations regarding the Voting Agreement, the purported survival of the Investor Rights' Agreement following Vera's IPO, and the determination of Dr. Katabi's independence under Nasdaq rules." Doc. 40 at 8. Indeed, the FAC explicitly references and describes the Voting Agreement:

> Some of these rights were spelled out in a Second Amended and
> Restated Voting Agreement dated October 29, 2020 (the "Voting
> Agreement"). The Voting Agreement, which has not been publicly

> filed, gave each of the four principal Series C investors the right to
> designate a member of Vera's board of directors and obligated the
> investors to vote their Vera shares in favor of one another's
> designees.  Pursuant to the Voting Agreement, Sofinnova [Partners]
> designated Katabi as its representative on Vera's board, and she has
> served continuously in that role since October 2020.

¶¶ 24-26.

The FAC also states that the Voting Agreement terminated upon the completion of

the IPO in May 2021 which "[Dr.] Katabi's board service" survived.  ¶¶ 32-33.  The FAC

alleges that "[t]he board's determination of [Dr.] Katabi's independence was thus based

on the nature of her relationship with [Vera]'s management and other agents, *not* her

relationship with Defendants."  ¶ 97.  However, nothing in the complaint directly

references the registration statement.  Further, Defendants do not argue that in referencing

to the Voting Agreement in the FAC, Plaintiffs necessarily relied on the IPO registration.

It is thus unclear whether Plaintiffs relied upon Vera's IPO registration statement in

framing the complaint.  Vera's IPO registration statement is therefore not incorporated

into the complaint.  While the Court may take judicial notice of Vera's IPO registration

statement as an SEC filing, it is inappropriate for the Court to consider it for the truth of

its assertions at this juncture.  *See Chechele v. Scheetz*, 466 Fed. Appx. at 40–41.

The FAC attaches excerpts of Vera's 2023 proxy statement as an exhibit.  Doc. 31-

11.  Plaintiffs thus explicitly incorporate Vera's 2023 proxy statement in the FAC and the

hCourt can consider it in full.

Vera's Form 8-K, however, is nowhere mentioned in the FAC.  Even though

Defendants argue that the Form 8-K contradicts facts in the FAC, at this juncture the Court

cannot consider the Form 8-K for its truth.  *See In re Turquoise Hill Res. Ltd.*, No. 20 Civ.

8585 (LJL), 2024 WL 4711185, at *10 (S.D.N.Y. Nov. 7, 2024) (quoting *Lively v. WAFRA

Inv. Advisory Grp., Inc.*, 6 F.4th 293, 306 (2d Cir. 2021) ("[A] court may not resolve the

motion [to dismiss] by weighing the plausibility of competing allegations or by considering

evidence extrinsic to the non-movant's pleading.")).

**B. Section 16(b)**

Section 16(b) of the Securities Exchange Act requires that certain defined "insiders" of an issuer of securities disgorge any profits derived from short-swing trades in those securities. *Olagues v. Perceptive Advisors LLC*, 902 F.3d 121, 122 (2d Cir. 2018); 15 U.S.C. § 78p(b). To establish liability under Section 16(b), a plaintiff must prove that "there was (1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a shareholder who owns more than ten percent of any one class of the issuer's securities (4) within a six-month period." *Connell v. Johnson*, No. 20 Civ. 1864 (LLS), 2020 WL 2748439, at *2 (S.D.N.Y. May 27, 2020) (quoting *Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998)).

The parties do not dispute that Sofinnova Partners purchased and sold Vera's securities within a period of less than six months, between January 30, 2024, and March 25, 2024. ¶¶ 122–124. The only dispute concerns whether Defendants were "officer[s] or director[s] of the issuer or a shareholder who own[ed] more than ten percent of any one class of the issuer's securities."

Plaintiffs rest their case on the theory that Defendants were "directors by deputization" of Vera. ¶ 121. Specifically, Plaintiffs contend that Defendants placed Dr. Katabi as their representative on Vera's board, where she had regular access to confidential information about Vera, and that Defendants used that information in making investment decisions. ¶ 120.

The Supreme Court found that under Section 16(b), "an investor becomes a statutory insider when it deputizes an individual to serve as its representative on an issuer's board of directors." *Roth v. Armistice Capital, LLC*, No. 1:20 Civ. 8872 (JLR), 2024 WL 1313817, at *7 (S.D.N.Y. Mar. 27, 2024) (quoting *Rubenstein v. Int'l Value Advisors, LLC*, 959 F.3d 541, 550 (2d Cir. 2020)). The SEC has recognized that under the deputization theory "a corporation, partnership, trust or other person can be deemed a director for purposes of [S]ection 16 where it has expressly or impliedly 'deputized' an individual to

serve as its representative on a company's board of directors." *Roth ex rel. Beacon Power Corp. v. Perseus L.L.C.*, 522 F.3d 242, 246 (2d Cir. 2008) (quoting *Ownership Reports and Trading by Officers, Directors and Principal Stockholders,* 53 Fed.Reg. 49997, 50000 (Dec. 13, 1988)).

In the Second Circuit, "deputization is a question of fact to be settled case by case and not a conclusion of law." *Calenture, LLC v. Pulte*, No. 21 Civ. 402 (PKC), 2022 WL 912947, at *3 (S.D.N.Y. Mar. 29, 2022) (quoting *Feder v. Martin Marietta Corp.*, 406 F.2d 260, 263 (2d Cir. 1969)). The Circuit found deputization in *Feder* because "[the director's] control over [the shareholding entity's] investments, coupled with his position on the Board of Directors . . . placed him in a position where he could acquire inside information concerning [the issuer] and could utilize such data for [the shareholding entity's] benefit without disclosing this information to any other [shareholding entity] personnel" and because the record indicated that the "[shareholding entity] may have benefited, or intended to benefit, from [the director's] association with [the issuer]." *Feder*, 406 F.2d at 263.

There is little caselaw in this Circuit to determine whether deputization has occurred. *Pulte*, 2022 WL 912947, at *3 ("Further guidance from the Circuit on the applicable standard to determine whether deputization has occurred is limited, as are district court cases that have fully litigated the issue.").

Defendants argue that the theory of director by deputization does not apply here. In view of the lack of Section 16(b) precedent, Defendants cite to Romeo & Dye, "a leading [S]ection 16 treatise," *Pulte*, 2022 WL 912947, at *3, which lists five factors to assess whether deputization has occurred.

> (1) Whether the shareholding entity recommended the director for election or appointment to the board;
>
> (2) Whether the shareholding entity recommended the director for the purpose of protecting or representing the entity's interests rather than for the purpose of guiding or enhancing the issuer's business activities;

(3) Whether the director regularly gained access to material
nonpublic information about the issuer;

(4) Whether the director shared the confidential information with
the shareholding entity; and

(5) Whether the shareholding entity used the information to inform
its investment strategy regarding the issuer's securities.

Peter J. Romeo & Alan L. Dye, Section 16 Treatise and Reporting Guide, 229–30 (5th ed.
2019); Doc. 37 at 18 ("Romeo & Dye").

To be sure, deputization has been found where one or more of the Romeo & Dye
factors were missing. In *Feder*, for example, deputization was found in the absence of the
first two factors. 406 F.2d at 263. There, the director joined the board at the invitation of
the issuer instead of the investor's recommendation. *See also Lowey v. Howmet Corp.*, 424
F. Supp. 461, 463 n.4 (S.D.N.Y. 1977) (finding that the determination of deputization was
triable even though the director joined the board at the issuer's invitation, as opposed to
being recommended by the investor). In *Segen v. CDR-Cookie Acquisitions, L.L.C.*,
deputization was found despite the absence of the first fourth and fifth factors. No.
5 Civ. 3509 (RWS), 2006 WL 59550, at *6 (S.D.N.Y. Jan. 4, 2006) (finding that "this right
was exercised to appoint three employees of CD&R entities to serve as Covansys directors"
even though the deputy did not share confidential information and strategize using the
information).

In other words, the Romeo & Dye factors are not necessary to establish
deputization. Despite Defendants' assertions, the absence of certain of the Romeo & Dye
factors does not mean that the deputization theory is inapplicable. *Cf.* Doc. 37 at 20–26;
*cf.* Romeo & Dye, § 2.04[5], at 230 ("[A]n entity will be deemed a director by deputization
only if, at a minimum, the [above five] facts are present.").

A Court may nonetheless use the Romeo & Dye framework in assessing whether
deputization has occurred. *See Roth v. Armistice Cap., LLC*, No. 20 Civ. 8872 (JLR), 2024
WL 1313817, at *11 n.4 (S.D.N.Y. Mar. 27, 2024) ("Courts consider various factors "in

determining whether deputization has occurred," including [all five of the Romeo & Dye factors.]"); *Pulte*, 2022 WL 912947, at *3–4 ("The Court sets forth those five factors [in Romeo & Dye] here for consideration."); *Revive Investing LLC v. Armistice Capital Master Fund, Ltd.*, No. 20 Civ. 2849 (CMA) (SKC), 2023 WL 5608350, at *9 (S.D.N.Y. Aug. 30, 2023) (adopting the Romeo & Dye factors in conducting a deputization analysis).

   1. *Plaintiffs Plausibly Allege the First and Second Romeo & Dye Factors*

  The first two Romeo & Dye factors require Plaintiffs to plausibly allege that: (1) Defendants recommended Dr. Katabi for election or appointment to the board at the time of the transactions; and (2) Dr. Katabi was elected to Vera's board for the purpose of protecting Defendants' interests rather than guiding and enhancing Vera's business activities.

  Defendants argue that Vera's 2023 proxy statement states that "Dr. Katabi [wa]s qualified serve on our Board due to her experience serving on the boards of directors of life sciences companies and as a biopharmaceutical and biotechnology public and private company investor." Doc. 38-2 at 12. Whether Dr. Katabi's was qualified to serve on Vera's board, however, is not relevant to the first two Romeo & Dye factors.

  The FAC plausibly alleges that Defendants negotiated with Vera to secure board representation and other governance and economic rights to protect their investments. ¶ 22. The Voting Agreement gave each of the four principal Series C investors the right to designate a member of the board of directors and obligated the investors to vote their shares in favor of one another's designees. ¶¶ 24–25. Sofinnova Partners designated Dr. Katabi as its representative, and she has served continuously in that role since October 2020. ¶ 26. Further, pursuant to Vera's charter and bylaws, Dr. Katabi was elected as an "at-large" director in 2023 because, as "an unopposed director nominee," she could be elected "even if more votes [were] withheld from her than cast in her favor." ¶ 90.

  Defendants proffer Vera's Form 8-K, filed on May 16, 2023 to show that Vera's shareholders overwhelmingly voted to elect Dr. Katabi. Doc. 37 at 22. However, as

discussed earlier, at this juncture the Court cannot consider it for its truth. *See In re Turquoise Hill Resources Ltd.*, 2024 WL 4711185, at *10.

Defendants further argue that the Voting Agreement, which terminated at the time of Vera's IPO, did not support the subsequent designation of Dr. Katabi as independent by Vera. However, as the FAC alleges, Defendants' rights under §§ 3.5 and 3.6 of the Investors' Rights Agreement survived Vera's IPO. *Id.* ¶ 37. Pursuant to §§ 3.5 and 3.6, Defendants maintained the right to use Vera's confidential information to "monitor [their] investment in [Vera]," and they still have the right "to trade any security of a Public Company" free of any "confidentiality and non-use obligations." *Id.* ¶¶ 39–41. These facts plausibly support the deputization theory.

Defendants also assert that Dr. Katabi was deemed independent under the Nasdaq listing rules. Doc. 37 at 21. Defendants rely on an out-of-circuit case where the director who "was described to shareholders in public filings submitted to the SEC as an 'independent' director under Nasdaq rules" was not considered a deputized director. *Rubenstein v. Very Hungry, LLC*, 2015 WL 1509761, at *2–3 (D. Colo. Mar. 30, 2015). However, the Court notes that the finding of independence under Nasdaq rules in that case is merely one of the reasons the *Rubenstein* court refused to find deputization. *See id.* In addition, the *Rubenstein* court concluded that the director "did not have dispositive power over [the shareholding entity's] investment in [the issuer], was nominated to the board at the suggestion of [a third party] (not pursuant to an arrangement or understanding with [the issuer]), and [the issuer] directly compensated [the director] and reimbursed him for expenses." *Id.* The *Rubenstein* Court also found that the shareholding entity "did not have a contractual right to appoint a director" to the board and "expressly stated that it had no intention to seek board representation or plans to effect a change in [the issuer's] management or board." *Id.* at *3.

This case is distinguishable from *Rubenstein*. Here, Dr. Katabi is a "general partner," "director," "vice president," "management member," and "control person" of

Defendants.  ¶¶ 18, 31.  The Voting Agreement, negotiated between Defendants and three other investors, gave Defendants the right to designate Dr. Katabi as a member of Vera's board and obligated the three other investors to vote their Vera shares in favor of Dr. Katabi, as Defendants' designee.   ¶¶ 22, 24–25.   Further, the Investors' Rights Agreement guaranteed Sofinnova Partners' right to use confidential information for the purpose of "monitor[ing] its investment in [Vera]."  ¶ 41.  The fact that Dr. Katabi was considered "independent" in the Nasdaq filing thus only offers limited support to the determination that Dr. Katabi was not Defendant's deputy.  Plaintiffs further contend that the Nasdaq standard defines "independent director" by reference to the director's relationship with the issuer, *see* Nasdaq Stock Market LLC Rule 5605(a)(2), as opposed to the director's relationship with a significant shareholder.  Doc. 39 at 20; ¶ 96 ("[T]he board assessed its members' independence based on a 'review of all relevant identified transactions or relationships between each director, or any of his or her family members, and the Company, its senior management and its independent auditors.'").

Defendants reject Plaintiffs' argument that the "market understood" that Dr. Katabi "was representing the Sofinnova Defendants" as a deputized director on Vera's board due to a 45 day "lock-up" agreement.  Doc. 37 at 24; ¶¶ 54–61.  However, Defendants rely on *Lowinger v. Morgan Stanley & Co. LLC*, which does not discuss the deputization theory at all.  841 F.3d 122 (2d Cir. 2016).[6]

Accordingly, the complaint plausibly alleges that Defendants recommended Dr. Katabi for election to Vera's board to protect their investment interests.

### 2.  *Plaintiffs Plausibly Allege the Third, Fourth, And Fifth Romeo & Dye Factors*

The last three Romeo & Dye factors require Plaintiffs to plausibly allege that:  (1) Dr. Katabi regularly gained access to material nonpublic information about Vera; (2) she shared the confidential information with Defendants; and (3) Defendants used the information to inform its investment strategy regarding the Vera's securities.  The parties

---

[6] Plaintiffs do not respond to Defendants' objection.

do not dispute that Dr. Katabi had regular access material nonpublic information about Vera. *See* Doc. 37 at 26.

Section 3.6 of the Investors' Rights Agreement provides that Vera may "disclose material nonpublic information about a Public Company" to any non-Surveyor investor as long as it gives prior notice of its intent to do so. ¶ 30. "Public Company" is defined as all companies that "have issued securities that are publicly traded." Doc. 37-1 § 3.6. The complaint thus plausibly alleges that pursuant to § 3.6, Defendants had the right to receive material nonpublic information about public companies, including Vera, from Vera, and that Dr. Katabi shared the confidential information with Defendants.

Dr. Katabi and Dr. Healy were the only natural persons who were "deemed to have shared dispositive power" over the Class A common stock held by Sofinnova Partners. ¶ 51. Defendants argue that being one of the two portfolio managers, Dr. Katabi "could not make any investment decisions on her own without Dr. Healy's vote." Doc. 37 at 28. Plaintiffs assert that assuming that Dr. Katabi and Dr. Healy each had veto power, Dr. Katabi "would not need to make 'decisions on her own' to take advantage of Vera's information because she could just nix Healy." Doc. 39 at 23. The FAC alleges that "[a]ll transactions in Vera's equity securities by Defendants over the past year were made under Dr. Katabi's purview as a "general partner" of Sofinnova Partners." ¶ 55. A reasonable inference can be drawn that Dr. Katabi had control of Sofinnova Partners' business decisions.

In *Feder*, the trading decisions were initiated by another officer but ultimately approved or vetoed by the director who sat on the issuer's board. 406 F.2d at 264. The *Feder* Court found that the director's control over the shareholding entity's investments, coupled with his position on the board of directors of the issuer, placed him in a position where he could acquire inside information concerning the issuer and could utilize such data for the shareholding entity's benefits without disclosing the information to any other shareholding entity's personnel. *Id.* The *Feder* Court further concluded that a person in

the director's unique position could act as a deputy for the shareholding entity even in the absence of factors indicating an intention or belief on the part of both companies that he was so acting. *Id.* at 265. While the *Feder* Court clarified that the sole fact of the director's control of the shareholding entity does not mandate deputization, it recognized that additional evidence indicating that both companies "intended" that the director should act as the shareholding entity's deputy on the board and believed that he was so acting would support the finding of deputization. *Id.*

Similar to *Feder*, the FAC plausibly alleges that Dr. Katabi was designated a deputy by Defendants starting in 2020 pursuant to the Voting Agreement, ¶¶ 20, 24–25, and then continued to represent Defendants on Vera's board by taking advantage of Vera's charter, bylaws, and board entrenchment provisions. ¶ 81. As analyzed above, pursuant to § 3.6, Defendants were thus able to receive material nonpublic information about Vera through Dr. Katabi at the time of the transactions at issue. ¶ 30. Dr. Katabi's unique position as the "control person" of Sofinnova Investments, Inc., the holding company for Sofinnova Partners, enabled her to acquire Vera's confidential information and utilize it for Defendants' benefit. *Feder*, 406 F.2d at 264 ("Bunker's control over Martin Marietta's investments, coupled with his position on the Board of Directors of Sperry Rand, placed him in a position where he could acquire inside information concerning Sperry and could utilize such data for Martin Marietta's benefit without disclosing this information to any other Martin Marietta personnel.").

The complaint thus plausibly alleges that Dr. Katabi regularly had access to material nonpublic information about Vera which she shared with Defendants, and Defendants used the information to inform its investment strategy regarding the Vera's securities.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion is DENIED.

A status conference is scheduled for July 30, 2025, at 10:00 a.m. in Courtroom 619 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, NY 10007. The Clerk of Court is respectfully directed to terminate the motion, Doc. 36.

It is SO ORDERED.

Dated: July 21, 2025
     New York, New York

_____

EDGARDO RAMOS, U.S.D.J.